UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLINDIA BARLEY,

       Plaintiff,

v.                              Case No. 23-12746

MEIJER GREAT LAKES LIMITED      Sean F. Cox
PARTNERSHIP,                  United States District Court Judge

       Defendant.
_____/

## OPINION & ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff filed this action against her former employer, asserting age and disability discrimination claims. The matter is currently before the Court on Defendant's Motion for Summary Judgment, filed after the completion of discovery. The parties have briefed the issues and the Court concludes that oral argument is not necessary. Local Rule 7.1. For the reasons set forth below, the Court GRANTS the motion and dismisses Plaintiff's claims.

## BACKGROUND

Plaintiff Glindia Barley filed this action against Defendant Meijer Great Lakes Limited Partnership ("Meijer") in state court. Defendant Meijer removed the matter to federal court, based upon federal-question jurisdiction.

Plaintiff's original complaint is the operative complaint. It includes the following paragraph in the section addressing jurisdiction and venue:

9.      Plaintiff brings this action under the Age Discrimi nation in Employment Act 29 USC § 621, and ADA Amendments Act of 2008, Pub L No 110-325, 122 Stat 3553 (2008) *et seq*., Michigan's Elliot-Larsen Civil Rights

1

> Act, MCL 37.2201 *et seq*., Michigan's Persons with Disabilities Civil
> Rights Act, MCL 37.01101 *et seq* for discrimination based on age and
> disability.  She alleges she is owed compensatory and statutory damages,
> interest, costs, and attorney fees.

(Compl. at ¶ 9).  Thus, it references four statutes (the ADA, the ADEA, Michigan's ELCRA, and

Michigan's PWDCRA).

In Count I, titled "Age Discrimination In Employment Act" (Count I), Plaintiff asserts

the following claim under the ADEA;

> 34.    Plaintiff is in a protected class against discrimination under ADEA.
> 35.    Plaintiff was demoted due to her age.
> 36.    Plaintiff was qualified for the Deli Clerk position;
> 37.    Plaintiff was replaced by someone outside of the protected class.

(Compl. at 3-4).

In Count II, titled "Americans With Disabilities Act" (Count II), Plaintiff alleges that she

is "is an individual with a disability," that she "is qualified to perform the job requirements, with

or without reasonable accommodation," and that she "was discharged due to her handicap."  (*Id.*

at 4).

In what appears to be a scrivener's error, Plaintiff's Complaint does not have a separate

count "Count III" titled "PWDCRA," but the next section asserts a claim under Michigan's

PWDCRA.  (*See* Compl. at 5).  The Court will refer to this as Count III.  In it, Plaintiff alleges

that she is disabled within the meaning of the PWDCRA, that she was able to perform the

essential job functions of her prior position with reasonable accommodations, and that Defendant

intentionally discriminated against her in violation of the PWDCRA by discharging her without

a legitimate reason.

In Count IV, titled "Elliott Larsen Civil Rights Act," Plaintiff alleges that Defendant is

"an employer as defined by the ELCRA," and that the ELCRA "prohibits discrimination on the basis of age." (*Id.* at ¶¶ 48-49). Plaintiff alleges that, in violation of the ELCRA, Defendant "discriminated against Plaintiff due to her age," that she "was subjected to unlawful age discrimination on several occasions," and that "[u]ltimately, Plaintiff was terminated without a legitimate non-discriminatory reason." (*Id.* at ¶¶ 50-51). Plaintiff alleges that "Defendant's discriminatory and retaliatory conduct exhibited a willful and/or reckless indifference to Plaintiff's protected right to be free from age discrimination." (*Id.* at ¶ 53).

Discovery has closed and the matter is before the Court on Defendant's Motion for Summary Judgment.[1]

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

---

[1] Because there was an outstanding discovery motion filed when Defendant filed its summary judgment motion, this Court allowed Plaintiff to file a supplemental response brief after the magistrate judge ruled. Plaintiff filed that brief on October 22, 2024. Defendant then filed its reply brief on November 5, 2024.

3

(Scheduling Order at 2-3).

In support of its motion, Defendant filed "Defendant's Statement of Material Facts Not In Dispute."  (ECF No. 29, "Def.'s Stmt.").  In response, Plaintiff filed her "Counter-Statement" (ECF No 35, "Pl.'s Stmt.").

The relevant evidence submitted by the parties, construed in the light most favorable to Plaintiff, the non-moving party, is as follows.

Plaintiff Glindia Barley was born on July 16, 1944.  (Def.'s & Pl.'s Stmts. at ¶ 1).

Barley was hired by Meijer on March 21, 2022, as a Deli Clerk assigned to the Northville, Michigan store located at 20401 Haggerty Road, Northville, Michigan.  (Def.'s & Pl.'s Stmts. at ¶ 2).  Plaintiff made $14.75 per hour when she started.  (Pl.'s Dep. at 79).

Candice Lopez was a Human Resources Representative at Meijer's Northville store. (Lopez Dep. at 4).  Lopez hired Plaintiff.  (Lopez Dep. at 5).  At the time that Defendant hired her, Plaintiff was 78 years old.  During the interview process, Plaintiff told Lopez that she did not like to drive at night, so Meijer scheduled Plaintiff to work during the day.  (Lopez Dep. at 6).

Plaintiff's first day working at the deli at Meijer's Northville store was March 21, 2022. (Def.'s & Pl.'s Stmts. at ¶ 3).  Her last day working at the deli was March 31, 2022.  (Def.'s & Pl.'s Stmts. at ¶ 4).  Thus, she was employed at the deli for a time period of just ten days. During that ten-day period, Plaintiff worked as a deli clerk for a total of 4 full shifts (on March 22, 23, 25, and 27) before being transferred to a store Greeter position. Plaintiff also worked one 45 minute period on March 31, after which she was transferred to the Greeter position.  (Def.'s & Pl.'s Stmts. at ¶ 10).

Plaintiff testified that, during her first few days, her co-workers in the deli treated her well.  (Pl.'s Dep. at 94).  Plaintiff testified that changed after March 28, 2022.  (Pl.'s Dep. at 94).

Plaintiff testified that her co-worker Barbara said that she did not want to train Plaintiff because no one asked her to do so.  (Pl.'s Dep. at 87). Barbara also told Plaintiff she was "not dressed properly for working in the deli."  (*Id.*).  Plaintiff testified that her co-worker Ronesha did not permit her to do any work in the deli other than wash dishes.  (Pl.'s Dep. at 88).

Plaintiff further testified that, while she was working in the deli, one[2] co-worker named Yolanda called Plaintiff names like "Aunt Jemima, Miss Daisey, and Old Lady."  (Pl.'s Dep. at 82-88).

Plaintiff testified that she let Lopez know how Yolanda was attacking her with those comments.  (Pl.'s Dep. at 92-93).[3]  Plaintiff also told Lopez "all my life people have said you don't look your age" and questioned how her co-workers knew her age and Lopez told Plaintiff that she told them her age.  (Pl.'s Dep. at 93).

HR Representative Lopez testified that if any of Plaintiff's co-workers called Plaintiff names like "old lady, Aunt Jemima, or Miss Daisy," that would be inappropriate as she would view that as a form of harassment.  (Lopez Dep. at 50).

Robert Stevenson was the Deli Team Leader during the time Plaintiff worked in the deli. (Lopez Dep. at 6-7).  Not long after Plaintiff began working in the deli, Stevenson came to

---

[2]In her Complaint, Plaintiff alleged that three co-workers (Yolanda, Barbara, and Ronesha) called her those names.  During her deposition, however, Plaintiff testified that only Yolanda called her those names.  (Pl.'s Dep. at 87-88)

[3]Plaintiff testified she also reported Yolanda's comments to her supervisor.  (Pl.'s Dep. at 82-83).

Lopez and stated that Plaintiff's work performance in the deli was not adequate. (Lopez Dep. at 8).

Plaintiff testified that, toward the end March,[4] she was called upstairs and met with Lopez and Rob Stevenson. (Pl.'s Dep. at 95). During the conversation, Lopez stated that the deli department did not seem to be a good fit for Plaintiff but mentioned that Plaintiff could continue working at the store in a store greeter position. (Pl.'s Dep. at 95-98; Lopez Dep. at 8-11). The position of store Greeter paid that same hourly rate as the deli clerk position. (Lopez Decl., Lopez Dep. at 28; Def.'s Ex. 6).[5] Plaintiff's benefits as a Greeter were the same as the benefits she received in the deli clerk position. (Lopez Decl.).

When Plaintiff began working in the store Greeter position, she had no work restrictions, other than not wanting to drive at night. (Pl.'s Dep. at 105, "I could sit. I could stand, all that stuff."). As a store Greeter, Plaintiff greeted customers as they entered the store's entrances and kept an eye out for suspicious activity. (Pl.'s Dep. at 103; Lopez Dep. at 11). The Northville store has two entrances, both of which have benches located immediately next to or near the entrances. (Lopez Decl., ECF No. 42-2, at ¶ 4). Plaintiff enjoyed working as a store Greeter. (Pl.'s Dep. at 107).

Plaintiff continued working as a Greeter at the Northville store without restrictions, until June 8, 2022, when she experienced chest pain and dizziness at work. (Def.'s & Pl.'s Stmts. at 17). On that day, Plaintiff brought some items to the store that she had purchased and wanted to

---

[4]Plaintiff did not recall the date. (Pl.'s Dep. at 94)

[5]Plaintiff testified that she was not sure what her hourly rate was as a greeter, but she thought it may have been less, but has no documents such as W-2 forms or paystubs that reflect her hourly rate as a greeter. (Pl.'s Dep. at 101-03).

return.  The cashier was going to give Plaintiff a store card, rather than a cash refund, and

Plaintiff wanted cash.  The cashier called a "store boss" (later identified as Terra Park) over to

ask if Plaintiff could be given cash.  Plaintiff testified:

> The person that she asked said that I was a WIC person.  I didn't know what it
> was until I looked it up later.  It's something to do with welfare women, infant and
> children.  So she said that that's what you people do.  I was embarrassed in front
> of the customers and people that hear her, so it made me cry.

(Pl.'s Dep. at 110).  Plaintiff became very upset and also became very dizzy.  (Pl.'s Dep. at 111).

An ambulance was called by management and Plaintiff was taken to the hospital.  (*Id*. at 111-

113).

Plaintiff was off work for medical reasons between June 8, 2022, and September 6, 2022.

(Def.'s & Pl.'s Stmts. at ¶ 18).

Upon returning to work on September 6, 2022,[6] Plaintiff gave Defendant a return-to-work

from her physician, Dr. Bruce Terrio, M.D.  (Def.'s Ex. 9).  It stated that Plaintiff may return to

work on September 5, 2022, with only three limitations: 1) she needed to sit during working

hours; 2) she cannot lift more than 10 pounds; and 3) she may need "frequent breaks (eg every 1

to 2 hrs as necessary)."  (*Id*.).

It is undisputed that Defendant accommodated Plaintiff's restriction of not lifting more

than ten pounds.  (Pl.'s. Dep. at 122).  Plaintiff also acknowledged during her deposition that she

was able to take breaks "every two hours," and that she did not ask for additional breaks because

---

[6]The parties dispute when Plaintiff gave Defendant Dr. Terrio's return-to-work form, with Defendant asserting that Plaintiff submitted it on September 7th and Plaintiff asserting that she submitted it on September 6th.  (Pl.'s Decl. at ¶ 3).  Because the Court construes the evidence in the light most favorable to Plaintiff, the Court uses the September 6th date.

"they were fine."  (*Id.*).

Plaintiff testified that Defendant provided her with a chair on the next day after she returned to work.  (Pl.'s Dep. at 116).  She testified she was provided with a "chair," not a "stool."  Plaintiff testified it "was a regular chair," with "no back," and testified "that's what I needed, just a chair."  (Pl.'s Dep. at 117).  Plaintiff testified that the chair provided to her "would go missing" at times after she left work.  (Pl.'s Dep. at 117).  When she came back into work she would then have to find one.  (Pl.'s Dep. at 118, "I always had a chair.  I had to find one.").  Plaintiff would find a chair in various areas of the store, like the deli, and use it at the entrances of the store.

When Plaintiff complained that the chair she was using was disappearing, a supervisor named Noah Rettig gave her another chair and suggested she keep it in her car.  (Pl.'s Dep. at 119).  Plaintiff testified that she always had her own chair after that (*Id.* at 120) but then she was told not to take the chair home anymore.  Plaintiff then began hiding her chair in the store, and that worked for a while, until somebody found her chair.  Plaintiff then had another chair, that she describes as "rickety," but she used it anyway.  (Pl.'s Dep. at 120-21).  Plaintiff had that chair until she left her employment.  (Pl.'s Dep. at 122).

A Meeting Report, signed by Plaintiff and her supervisor, indicates that her supervisor had a meeting with Plaintiff on November 1, 2022, regarding the responsibilities of the greeter position.  (Def.'s Ex. 10).  It indicates the "topics discussed" included the following on absences:

> Schedule and Call offs
> • Must follow schedule
> • Call Offs: You must call the store to speak with AP or 611 to inform AP (623) or 611 (SDIC) if unable to get a hold of AP. You must notify us that you are not going to be in.   Failure to do so will be a no call no show for attendance.

8

- Must give at least 1-hour notice if calling off.  Failure to do so will be marked as improper call off

(*Id*.).

On November 15, 2022, Lopez and Plaintiff's supervisor Noah Retting had a meeting with Plaintiff.  (Lopez Dep. at 19-21; Pl.'s Dep. at 136; Def.'s Ex. 11, 11/15/22 Meeting Report).

Plaintiff testified that she had a meeting with Lopez and Rettig that date, and while she did not recall it being about attendance, she then referenced attendance records while discussing that meeting.  (Pl.'s Dep. at 136).

A November 15, 2022 Meeting Report reflects that an "Attendance Meeting" was held on that date, from 11:00 a.m. to 11:30 a.m. and that Plaintiff attended the meeting along with Lopez and Rettig.  It states as follows in the "Topics Discussed" section:

India Barley . . . is showing that she has been absent from work 6 times from 10/21/22-11/11/22.  India had called off for 3 shifts (11/4, 11/10 & 11/11) and had 3 No Call No Shows (10/21, 11/8 & 11/9).

On 11/1/22, a meeting report was conducted about the STEPS program, expectations of Greeter, Schedules and Call offs.  Since that meeting report that was conducted and signed and uploaded to India profile in workday, India has had 5 absences with 3 of them being call offs and 2 being No Call No Show absences.

. . . .

See Below for absences

• 10/21/22 Shift, India did not call into work resulting in a No Call No Show
• 11/4/22 Shift, India called off for the shift
• 11/8/22 Shift, India did not call into work resulting in a No Call No Show
• 11/9/22 Shift, India did not call into work resulting in a No Call No Show
• 11/10/22 Shift, India called off for the shift and indicated that she will not be back to work til Tuesday 11/15/22.  She is calling off for shifts for 11/11/22 & 11/12/22.

India is currently as of 11/15/2022 at a Level 1 at 5 incidents with 1 total Incident remaining before the next step that can result in a termination of employment.

Anymore [sic] absences/incidents may/will lead to further discipline up to and including termination.

(*Id.* at 1).  It states as follows in the "Questions/Comments" section:

During meeting with going over the attendance policy and current standing, and why India is at a Level 1 for attendance.  India was informed that she cannot have another absence in the next 90 days as she will be at the termination level of the attendance policy.

India stated that she has not been to work due to medical reasons and explained on why she has not been able to make it due to those.

SHRR Candice Lopez who witness the meeting, spoke to India about a leave that she could go on that can help with absences not be counted against her if she cannot make it to work.  Lopez indicated she will pull the paperwork for this type of leave and speak with her before Indica is off of work today (11/15/22).

(*Id.*).

Defendant's personnel records also include a written "Absence Warning" notice, dated November 17, 2022, stating much of the same information (Def.'s Ex. 12).  Consistent with that report, Lopez testified that Plaintiff was warned about her attendance at the November 15th meeting and told that she was nearing termination for her attendance.  (Lopez Dep. at 21-22).  Lopez testified that Plaintiff was told she "was at an attendance warning for call-offs and/or tardies," and Plaintiff responded that they were for medical reasons. (*Id.*).  Lopez provided Plaintiff with "paperwork to get filled out by her doctor to get an intermittent leave so that way her absences would be covered if they were for medical reasons," and Plaintiff stated she would work on it.  (*Id.* at 22).  Plaintiff similarly testified that she was told she needed take care of her "FMLA papers.  If I didn't do that, it will rule in a certain way or whatever."  (Pl.'s Dep. at 136).

After the November 15, 2022 meeting with Lopez and Rettig, Plaintiff was tardy to work on December 17, 2022, and absent on December 23, 2022.  (Def.'s Ex. 14; Lopez Decl.).  Lopez

and Plaintiff's new supervisor (Brandon Nichols) made the decision to terminate her

employment for attendance.  (Lopez Dep. at 19-21).

On January 4, 2023, Plaintiff was called into a meeting with Nichols, Lopez, and some

others, and was told that she was being terminated because of her attendance.  (Pl.'s Dep. at 154-

57; Lopez Dep. at 19- 22 & 32).  Plaintiff submitted a Declaration wherein she states that she

was not given any written documentation of attendance incidents, including at the meeting

wherein she was terminated.  (Pl.'s Decl. at ¶ 6).

Defendant's personnel records contain an "Attendance Termination" notice, dated

December 21, 2022.  (Def.'s Ex. 14).

On or about June 12, 2023, Plaintiff filed a Charge of Discrimination against Defendant,

stating:

> I began working for the above-named employer on or around March 22, 2022.
>
> In or around June 2022, I had an emergency episode at work due to my disability.
> I was hospitalized and unable to work for about two months. In or around August
> 2022, I returned to work.  I was able to successfully perform my job duties with
> reasonable accommodation.  While initially granted, my reasonable
> accommodations were routinely denied.  I was denied the ability to use the
> restroom, and I was denied the ability to sit down and briefly rest as required by
> my disability. My employer intentionally made it difficult to do my job.  Despite
> this, I was able to perform my work successfully. On or around January 4, 2023, I
> was terminated.  The reason I was given was that I had been "excessively absent."
> The only absences that I took were due to my disability. I believe that I was
> discharged from employment due to my disability and in retaliation for
> complaining about disability-based discrimination.

(Def.'s Ex. 17).

## STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.' " *Peffer v. Stephens*, 880 F.3d 256, 262 (6th

Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

As the party bringing the summary judgment motion, Defendant Meiher "has the initial

burden of informing the district court of the basis for its motion and identifying portions of the

record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*,

344 F.3d 587, 595 (6th Cir. 2003) (citation omitted).  When a motion for summary judgment is

properly made and supported and the nonmoving party fails to respond with a showing sufficient

to establish an essential element of its case, summary judgment is appropriate. *See Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Sixth Circuit has explained that "Rule 56 places an affirmative duty on the

nonmovant to cite to 'particular parts of materials in the record' to establish that a particular fact

cannot be supported or is genuinely disputed. Fed.R.Civ.P. 56(c)(1); *see Chicago Title Ins. Corp.*

*v. Magnuson*, 487 F.3d 985, 995 (6th Cir.2007)."  *Emerson v. Novartis Pharm. Corp*., 446 F.

App'x 733, 734 (6th Cir. 2011).  "District courts need not independently comb through the

record and establish that it is bereft of a genuine issue of material fact before granting summary

judgment."  *Emerson, supra*.

## ANALYSIS

Defendant's summary judgment motion seeks summary judgment in its favor as to all

claims asserted by Plaintiff.

**I.      Plaintiff's ADEA Claims**

Defendant contends that Plaintiff's ADEA claims in Count I should be dismissed because she failed to exhaust her administrative remedies as to her ADEA claims.

Notably, in response to the pending motion, Plaintiff does not oppose Defendant's challenge to her ADEA claims.  Thus, this Count will be dismissed with prejudice, as Plaintiff has abandoned her ADEA claims.

**II.     Plaintiff's ADA / PWDCRA Claims**

Plaintiff's Complaint asserts disability discrimination claims under both the ADA and Michigan's PWDCRA.  Because Michigan's PWDCRA substantially mirrors the ADA, these claims are generally analyzed identically.  *Hrdlicka v. General Motors, LLC*, 63 F.4th 555, 556 (6th Cir. 2023).  This Court will therefore analyze those claims together but noting where they differ.

Defendant's summary judgment motion notes that Plaintiff has alleged (or asserted during discovery) several different kinds of ADA/PWDCRA claims and it seeks summary judgment in its favor as to them all.

**A.      Discriminatory "Transfer Claims"**

In challenging Plaintiff's disability discrimination claims under the ADA and Michigan's PWDCRA, Defendant's motion notes that Plaintiff has alluded to asserting claims based on Defendant transferring Plaintiff from the deli to the greeter position, or failing to transfer Plaintiff to a store detective position.  Defendant contends that, to the extent Plaintiff is seeking to pursue such claims, they fail.

**1.      Exhaustion Challenge**

Defendant notes that Plaintiff's Charge of Discrimination cited only two actions by Meijer as being discriminatory under the ADA: 1) its alleged failure to accommodate Plaintiff's disability when she returned to work in September of 2022; and 2) its termination of Plaintiff in January of 2023. Defendant contends that, as to any other ADA claims referenced or alluded by Plaintiff, such a discriminatory transfer claim based on her being transferred from the deli to a greeter position, Plaintiff cannot proceed with such claims because she failed to administratively exhaust such claims.

In response, Plaintiff does not oppose this challenge as to any ADA discriminatory transfers claims being subject to dismissal for failure to exhaust her administrative remedies as to such claims. Thus, the Court rules that any ADA transfers claims have been abandoned by Plaintiff.

### 2.      Other Challenges

In challenging Count III, Defendant again notes that Plaintiff has alluded to two other potential disability discrimination claims: 1) a claim that Plaintiff's transfer in March of 2022 was discriminatory; and 2) a claim for failure to transfer Plaintiff to a store detective position. Defendant then challenges each of those such claims, to the extent that Plaintiff asserts such claims. (Def.'s Br. at 13-17).

In response to the motion, however, Plaintiff does not oppose the challenges to those claims. Thus, she has abandoned such claims.

### B.      Discriminatory Discharge Claim

Defendant acknowledges that Plaintiff administratively exhausted her ADA claim that she was discharged from her greeter position in January of 2023 because of her disability. (Def.'s Br. at 7-8). Defendant contends that it is entitled to summary judgment on that claim (and

14

her PWDCRA claim) because Defendant has a legitimate, non-discriminatory reason for her

discharge, and Plaintiff cannot establish pretext.

Plaintiff does not assert that she has direct evidence to support her discriminatory

discharge claim.  Rather she advances her theory of discrimination via circumstantial evidence.

The burden-shifting framework that applies is therefore as follows:

> To establish a prima facie case, an employee must demonstrate that (1) she
> has a disability, (2) she is otherwise qualified for the job "with or without
> reasonable accommodation," (3) she "suffered an adverse employment decision,"
> (4) her employer "knew or had reason to know" of her disability, and (5) her
> position remained open, or she was replaced. *Williams v. AT&T Mobility Servs.*
> *LLC,* 847 F.3d 384, 395 (6th Cir. 2017) (quoting *Whitfield v. Tennessee*, 639 F.3d
> 253, 259 (6th Cir.  2011)).
>
> If the employee establishes a prima facie case, the burden shifts to the
> employer to "demonstrate that there was a legitimate, nondiscriminatory reason
> for the adverse employment action." *Id*. (citing *Whitfield,* 639 F.3d at 259). The
> burden then shifts back to the employee to show that the purported
> nondiscriminatory reason "was actually a pretext designed to mask
> discrimination." *Id*. (citing *Whitfield,* 639 F.3d at 259).

*Hrdlicka*, 63 F.4th at 566-67.

Here, Defendant streamlines it challenge to the discharge claim and assumes, for

purposes of its motion, that Plaintiff can establish a prima face case of disability discrimination.

Defendant states that it had a legitimate, nondiscriminatory reason for discharging Plaintiff – her

excessive absenteeism.  It argues:

> Meijer terminated Plaintiff's employment because of her excessive
> absenteeism. Meijer policy states that where an employee has accumulated more
> than six attendance incidents in a 90-day period, termination will occur. SOF ¶26,
> 27. Here, Plaintiff had incidents on October 21, November 4, 8, 9, 11 and 12, and
> on December 17 and 23, exceeding the six6 permitted incidents over 90 days.
> SOF ¶29.  Store management made the decision to terminate based on Meijer
> policy –a reason entirely unrelated to Plaintiff's age or disability.

(Def.'s Br. at 9-10).

15

Once an employer proffers a legitimate, nondiscriminatory reason for making an adverse employment decision, the employee must present proof that the stated reason is pretextual in order to create a genuine dispute regarding a claim of disability discrimination. *Hrdlicka, supra,* at 569.  "To establish pretext, the employee must show 'that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" *Id*. (citations omitted).

Here, Plaintiff asserts that Defendant's stated reason for her termination "had no basis in fact" and did not actually motivate Defendant's decision to terminate her.  (Pl.'s Br. at 12).  As the evidence of pretext, Plaintiff identifies that she was not disciplined for absenteeism prior to her termination.  Plaintiff also asserts that she "had no write ups."  (*Id*.).

While Defendant did not impose discipline (such as a suspension) upon Plaintiff prior to her termination, the admissible evidence before the Court reflects that Defendant did verbally warn Plaintiff of her attendance problems and that she would be subject to dismissal if her attendance problems continued.  Contrary to Plaintiff's assertions in her brief, there are written records regarding Plaintiff's attendance problems documenting the warnings she was given about them.

Plaintiff also relies on Lopez's deposition testimony as evidence of pretext, asserting that Lopez testified that she: 1) did not know how many absences Plaintiff had that led to the November warning; 2) did not know how many absences Plaintiff had which led to her termination; and 3) did not know the specific dates of her absences.  (Pl.'s Br. at 12).  This argument is misplaced.  Lopez was the Northville store's HR representative, overseeing more than 250 employees.  Lopez was deposed in this case on August 7, 2024 – well over a year after

16

Plaintiff's termination.  Thus, is not surprising that Lopez could not recall, from her independent

memory, the date of Plaintiff's absences:

> Q.    Do you know the specific dates of any absences that Glindia had which,
>        first of all, contributed to the warning?
> A.    I don't know offhand.  I would have to refer back to records.

(Lopez Dep. at 24-25).  That Lopez could not recall the dates from memory is not evidence of

pretext.

The Court concludes that Plaintiff has not presented the Court with sufficient evidence of

pretext to create an issue of fact.  Defendant is entitled to summary judgment in its favor as to

Plaintiff's wrongful discharge claim.

### C.    Failure-To-Accommodate Claim

Defendant acknowledges that Plaintiff administratively exhausted her claim that

Defendant failed to accommodate Plaintiff's disability when she returned to work in September

of 2022.

To establish a prima facie case of discrimination based on failure to accommodate, a

plaintiff must demonstrate that: 1) she is disabled; 2) she is otherwise qualified for the position;

3) her employer knew or had reason to know of her disability; 4) she requested an

accommodation; and 5) her employer failed to provide the necessary accommodation.  *Brumley*

*v. United Parcel Serv., Inc*., 909 F.3d 834, 292, 307 (6th Cir. 2018) (ADA).   Even where a

plaintiff is able to demonstrate a reasonable accommodation, "a defendant can still be granted

summary judgment if there are no genuine issues of material mater controverting the conclusion

that the reasonable accommodation would impose an undue hardship on the employer."

*Cleveland v. Federal Express Corp*., 83 F. App'x 74, 79 (6th Cir. 2003).

Meijer contends that it is entitled to summary judgment on Plaintiff's failure-to-accommodate claim because the evidence shows that Defendant granted the only accommodations that Plaintiff requested.

To analyze this challenge, the Court must first consider what accommodations Plaintiff actually requested from Meijer.

Michigan's PWDCRA expressly requires a request for an accommodation to be made in writing.  Mich. Comp. Laws § 37.1210(8); *see also Hodnett v. Chardam Gear Co., Inc.,* 749 F. App'x 390, 396 n.2 (6th Cir. 2018).  The ADA does not require a request for accommodation to be in writing but the employee must communicate a need for an adjustment at work because of a disability.   *Smith v. Henderson*, 376 F.3d 529, 535-36 (6th Cir. 2004); *see also Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007) (Explaining that while an employee "need not use the magic words 'accommodation,'"the request for an accommodation at work does need to make it clear "that it is being made to conform with existing medical restrictions.").

Plaintiff's only *written* request for accommodations, provided to Meijer, was Dr. Bruce Terrio's return-to-work letter that stated Plaintiff may return to work on September 5, 2022, with only three limitations: 1) she needed to sit during working hours; 2) she cannot lift more than 10 pounds; and 3) she may need frequent breaks (eg every 1 to 2 hrs as necessary).  Thus, these are the only accommodations for purposes of Plaintiff's claim under the PWDCRA.

In addition to those accommodations, however, Plaintiff's brief suggests that Meijer failed to provide her other accommodations, such as: 1) providing her with a chair with arms or poles strong enough to allow her to pull herself up from a seated position; and 2) providing Plaintiff with access to a handicap bathroom stall that had bars that would enable Plaintiff to pull

18

herself up and down from the toilet.  But Plaintiff has not provided the Court with evidence that she requested those accommodations at work in order to conform with her existing medical restrictions.

Plaintiff provides no evidence that she ever advised Lopez or any of her supervisors that she needed to be provided with a specialized chair, with arms or poles strong enough to allow her to pull herself up from a seated position.  Rather, the only accommodation requested was for Plaintiff to be allowed "to sit" while working.

Plaintiff has also failed to provide the Court with sufficient evidence to create an issue of fact that she made a request for any bathroom accommodations at work as being needed to conform with her medical restrictions.  Rather, Plaintiff directs the Court to her deposition testimony wherein Plaintiff testified that she brought a toilet being out of order to the attention of a store manager (not Lopez or one of her supervisors), on several occasions.  (Pl.'s Dep. at 123-26).  That does not suffice to put Plaintiff's supervisors on notice that she needed any specific bathroom accommodations at work because of her medical restrictions.

Accordingly, the only accommodations actually requested by Plaintiff were those set forth in Dr. Terrio's return-to-work form.

Plaintiff has failed to come forth with sufficient evidence to create an issue of fact as to her claim that Meijer failed to provide those accommodations to her.

It is undisputed that Defendant accommodated Plaintiff's restriction of not lifting more than ten pounds.  (Pl.'s Dep. at 122).  Plaintiff also acknowledged during her deposition that she was able to take breaks "every two hours," and that she did not ask for additional breaks because "they were fine."  (*Id.*).

That leaves the final accommodation that was actually requested, *Plaintiff being permitted to sit while working*.  The evidence before the Court establishes that Plaintiff was able to sit while working after returning to work.

Plaintiff testified that Defendant provided her with a chair on the next day after she returned to work.  (Pl.'s Dep. at 116).  Plaintiff testified it "was a regular chair," with "no back," and testified "that's what I needed, just a chair."  (Pl.'s Dep. at 117).   Plaintiff testified that the chair provided to her "would go missing" at times after she left work.  (Pl.'s Dep. at 117).  When she came back into work she would then have to find one.  (Pl.'s Dep. at 118, "I always had a chair.  I had to find one.").  Plaintiff would find a chair in various areas of the store, like the deli, and use it in the entrances to the store.

When Plaintiff complained that the chair she was using was disappearing, a supervisor gave her another chair and suggested she keep it in her car.  (Pl.'s Dep. at 119).  Plaintiff testified that she always had that chair after that (*Id*. at 120) but then she was told not to take the chair home anymore.  Plaintiff then began hiding her chair in the store, and that worked for a while, until somebody found her chair.  Plaintiff then had another chair, that she describes as "rickety," but she was able to use it. (Pl.'s Dep. at 120-21).  Plaintiff had that chair until she left her employment.  (Pl.'s Dep. at 122).

Thus, Plaintiff's testimony establishes that, with the exception of one day, she had a chair that she was able to sit on while working as a Greeter.

And even as to her first day back, Plaintiff does not present the Court with any evidence to establish that she was *not able to sit during work on that day.*  Notably, the Northville Meijer store has benches in the areas where the store Greeters work and, as Plaintiff's testimony shows,

there were chairs in various areas of the store that Plaintiff was able to retrieve and use.

The Court grants summary judgment in favor of Defendant as to Plaintiff's failure-to-accommodate claims under both the ADA and Michigan's PWDCRA.

**III.    Plaintiff's ELCRA Age-Based Claims**

Plaintiff's Complaint asserts two age discrimination claims against Defendant under Michigan's ELCRA: 1) that Plaintiff was discharged due to her age; and 2) an age-based hostile work environment claim.  Defendant seeks summary judgment in its favor as to both claims.

**A.    Discharge Claim**

In Count IV, Plaintiff alleges that Defendant violated the ELCRA by terminating Plaintiff's employment to her age.

Because Plaintiff does not have direct evidence to support this claim, it is analyzed under the same burden-shifting framework that is addressed above in Section II. B. of this Opinion and Order.

Defendant's motion assumes for purposes of the motion that Plaintiff can establish a prima facie case of age discrimination.  Defendant contends that it discharged Plaintiff for a legitimate, non-discriminatory reason – her excessive absenteeism.  Defendant contends that Plaintiff cannot come forward with evidence to establish pretext.

Thus, this claim is subject to the same analysis as set forth above in Section II. B. and the Court will grant summary judgment in favor of Defendant on this claim.

**B.    Age-Based Hostile Work Environment Claim**

To establish an age-based hostile work environment claim under the ELCRA, a plaintiff must establish: 1) she was 40 years old or older; 2) she was subjected to harassment, either

through words or actions, based on age; 3) the harassment had the effect of unreasonably

interfering with the employee's work performance and creating an objectively intimidating,

hostile, or offensive work environment; and 4) there exists some basis for liability on the part of

the employer. *Shrivasta v. RBS Citizens Bank, N.A.*, 227 F. Supp.3d 824, 846 (E.D. Mich. 2017).

Defendant contends that cannot meet the third element. The Court agrees.

To meet the third element, the harassing conduct must be "severe or pervasive enough to

create an environment that a reasonable person would find hostile or abusive, and the victim

must subjectively regard that environment as abusive." *Thornton v. Federal Express Corp.*, 530

F.3d 451, 455 (6th Cir. 2008). To assess this third element, this Court considers all of the

relevant circumstances, including the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interfered with the employee's performance at work. *Id.* The Court considers the

harassment "by all perpetrators combined," but only considers harassment that is *based on the*

*protected class* at issue. *Williams v. CSX Transp. Co., Incl*, 643 F.3d 502, 511 (6th Cir. 2011);

see also

As to the harassment based on the protected class, "offhand comments" and "isolated

incidents" do not suffice. *Hunter v. General Motors, LLC*, 807 F. App'x 540, 545 (6th Cir.

2020) (citations omitted). Rather, Sixth Circuit "precedent presents 'a relatively high bar for

what amounts to actionable discriminatory conduct under a hostile work environment theory."

*Id.* (quoting *Phillips v. UAW Int'l,* 854 F.3d 323, 328 (6th Cir. 2017)).

Plaintiff worked in the deli at Meijer's Northville store during a ten day period, during

which she only worked four full shifts. Notably, Plaintiff testified that her co-workers treated

her fine at first but then made objectionable comments – on or after March 28, 2022.  Thus, the alleged comments made in the deli are alleged to have occurred over a one or two-day time period.

Plaintiff testified that her co-worker Barbara said that she did not want to train Plaintiff because no one asked her to do so.  (Pl.'s Dep. at 87).  Barbara also told Plaintiff she was "not dressed properly for working in the deli."  (*Id*.).  Plaintiff testified that her co-worker Ronesha did not permit her to do any work in the deli other than wash dishes.  (Pl.'s Dep. at 88).  As Defendant notes, there is nothing age-related about those comments, and Plaintiff does not argue otherwise in her brief.

Rather, Plaintiff asserts that "[w]hile Plaintiff was in the deli, her co-workers, Yolanda, Barbara and Ronesha, called her names like Aunt Jemima, Miss Daisey and Old Lady."  (Pl.'s Br. at 2).  But Plaintiff actually testified that only Yolanda called her those names.  (Pl.'s Dep. at 87-88).  Thus, Plaintiff presents evidence that one co-worker called her those names during a one or two-day period, at the end of March of 2022.

Plaintiff also attempts to rely on a Meijer "boss" having referred to Plaintiff "as a WIC person" on one occasion on June 8, 2002 –  when Plaintiff was returning some items to the store as a customer.  (Pl.'s Br. at 21).  Plaintiff asserts that the inference from that remark "is hostility towards Plaintiff's age," which was 78 at the time. Plaintiff does not explain why she believes that to be the case, and it is not apparent to this Court, as Plaintiff testified that the term WIC is having to with "welfare women, infant and children."  This Court fails to understand how that comment can be construed as ageist.

Plaintiff also submitted a Declaration, wherein she claims that some unidentified co-

23

workers referred to her as "stinky old lady" while she was in the bathroom.  Plaintiff does not

provide any details as to the alleged frequency of those alleged comments, who they were made

by, or the date or dates on which they were made.  And unlike the offensive comments made by

Yolanda, that Plaintiff claims she reported to Lopez, Plaintiff does claim that she ever advised

management of any alleged "stinky old lady" comments made to her in the bathroom.

Moreover, even when considered collectively, these handful of alleged comments, are not

sufficiently severe or pervasive enough to support a age-based hostile work environment claim

under Michigan's ELCRA.

## IV.    Disability-Based Hostile Work Environment Claim Under PWDCRA

Plaintiff's response brief reflects that Plaintiff seeks to pursue a disability-based hostile

work environment claim under the PWDCRA.  (*See* Pl.'s Br. at 19).

Defendant argues that, assuming such a claim was pled by Plaintiff, is also entitled to

summary judgment on that claim:

> Plaintiff does not identify any particular offensive remarks or actions that are
> expressly tied to her disabilities, instead reciting a litany of perceived slights that
> are not objectively tied to her disability in any way, or relying on claims her
> disabilities were not accommodated despite her testimony directly to the contrary.
> That is precisely contrary to the *Williams* test, which requires the Court to
> consider only the incidents that are clearly tied to Plaintiff's disability in
> determining if there is a claim for trial. Plaintiff has not presented evidence of
> severe or pervasive harassment tied to her disability as is required to avoid
> summary judgment on this claim (assuming it even was pled).

(Def.'s Reply Br. at 7).

The Court agrees.

In order to bring a disability-based hostile-work environment claim, a plaintiff must

show: 1) she was a member of the protected class, that is, she was disabled; 2) she was subject to

24

unwelcome harassment; 3) *the harassment was based on her disability*; 4) the harassment had

the effect of unreasonably interfering with her work performance by creating an intimidating,

hostile or offensive work environment; and 5) the existence of liability on the part of the

defendant. *Gentry v. Summit Behavioral Healthcare*, 197 F. App'x 434, 437-38 (6th Cir. 2006)

(emphasis added).

Plaintiff has not presented sufficient evidence of disability-related harassment at Meijer

to support a hostile work environment claim.

For example, there is no evidence that Plaintiff was ridiculed or on insulted because of

her medical conditions. *Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005). Plaintiff

testified that some co-workers at Meijer made offensive remarks to her, but none of them were

disability-related. Yolanda's offensive comments (calling Plaintiff Aunt Jemima, Miss Daisey,

and Old Lady) were age and race-related, but not disability-related   And while Park's alleged

WIC remark certainly was offensive, it too was not related to Plaintiff's medical conditions or

her requested accommodations for them.

Plaintiff asserts that rather than honoring her requested accommodations, Meijer

subjected Plaintiff to "hostile conduct related to her disabilities." (Pl.'s Br. at 22). But Plaintiff

herself testified that Meijer accommodated Plaintiff's restriction of not lifting more than ten

pounds. (Pl.'s. Dep. at 122). She also acknowledged during her deposition that she was able to

take breaks "every two hours," and that she did not ask for additional breaks because "they were

fine." (*Id.*). Plaintiff's remaining accommodation was being permitted to sit while working, and

she testified that she was able to do that.

Plaintiff did testify that the chair she was using would go missing from time-to-time in

the store entrance areas after she left work, or she would have to hide it, so others would not use it.  That evidence, however, is not sufficient to meet the high bar of a disability-related hostile work environment claim.  The Court grants summary judgment in Defendant's favor on this claim.

### CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.


Dated:  March 10, 2025                          s/Sean F. Cox
                                                Sean F. Cox
                                                U. S. District Judge

I hereby certify that on March 10, 2025, the document above was served on counsel and/or the parties of record via electronic means and/or First Class Mail.

                                                s/Emily Vradenburg
                                                Case Manager